NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
CAAP-23-0000328
26-SEP-2025
08:06 AM
Dkt. 140 SO

NO. CAAP-23-0000328

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellant, v.
ANTHONY MORENO, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CASE NO. 2CPC-19-0000790)

SUMMARY DISPOSITION ORDER
(By: Nakasone, Chief Judge, Leonard and Wadsworth, JJ.)

Plaintiff-Appellant State of Hawaiʻi (**State**) appeals from the August 7, 2023 Findings of Fact, Conclusions of Law, and Order Granting Motion to Dismiss Indictment for Pre-Indictment Delay (**Dismissal Order**) entered by the Circuit Court of the Second Circuit (**Circuit Court**).[1]

In its point(s) of error, the State contends that the Circuit Court erred in granting Defendant-Appellee Anthony Moreno's (**Moreno's**) December 5, 2022 Motion to Dismiss Indictment for Pre-Indictment Delay (**Motion to Dismiss**), in which Moreno alleged that he was prejudiced by the loss of evidence resulting from the eighteen-year delay in bringing charges against him.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to

---

[1] The Honorable Kirstin M. Hamman presided.

the arguments advanced and the issues raised, we resolve the State's points of error as follows:

On October 27, 2000, Kimberly Belluomini's (**Belluomini's**) body was discovered in her second-floor apartment unit (**Apartment**) in the Southpointe Condominiums in Kihei, Maui (**Southpointe**).  After she did not show up for work that morning, Belluomini's brother, Todd Assmann (**Assmann**), and a work colleague of Belluomini's went to the Apartment to look for her. When they arrived, the deadbolts to the security screen door and front door of the Apartment were both locked.  Assmann used his set of keys to enter, and he found Belluomini's bedroom door locked.  Assmann kicked the bedroom door in and found Belluomini deceased under a blanket, with pillows on her head.  She was found lying on her back with a torn blouse, skirt, and bra.  Maui Police Department (**MPD**) launched an investigation that day to determine whether Belluomini's death was a homicide.  The investigation was led by Detective Brian Kaya (**Kaya**), aided by his supervisor, Lieutenant Glenn Cuomo (**Cuomo**).

On October 26, 2000, the previous evening, Belluomini went to Henry's Bar & Grill in Kihei (**Henry's**).  While at Henry's, Belluomini spoke at length with the bartender, Kyle Oshita (**Oshita**), and two other men, Keith Feigum (**Feigum**) and Moreno.  Several witnesses reported that Belluomini was intoxicated that evening, and at one point, Oshita cut her off from drinking.  Moreno told the police that he had sex with Belluomini after leaving Henry's together and going back to her Apartment.  Belluomini also had been drinking wine at her brother's house earlier that evening.  She also had an OBGYN

procedure earlier that day, which the Circuit Court determined the State had introduced for the purpose of suggesting that Belluomini would not have wanted to engage in sexual intercourse with Moreno that evening.

On November 25, 2019, more than nineteen years after Belluomini's death, Moreno was indicted on one count of second degree murder. Moreno was extradited from Florida to Hawaiʻi and taken into custody on $1 million bail pending trial. In granting the Motion to Dismiss in 2023, the Circuit Court made findings and conclusions concerning MPD's investigation, which include, *inter alia*, the following.

Henry's Bar Witnesses

Karen Blomker (**Blomker**) reported to MPD that, on the evening of October 26, 2000, at Henry's, Belluomini was talkative and slurring her words. At one point, Belluomini started walking towards the employee bathroom instead of the public bathroom, staggered, and nearly fell. Blomker saw Belluomini kiss Feigum, but she believed Belluomini was more interested in the bartender, Oshita. In 2023,[2] Blomker stated she had little memory of the events, expressed an unwillingness to cooperate, and lived out of state in Alaska.

Jodi Svela (**Svela**) also reported seeing Belluomini walking towards the employee bathroom rather than the public one, and she later observed her dancing with Moreno. In 2023, Svela no longer remembered what Belluomini or Moreno looked like.

---

[2] The date "2023" is used broadly because that is when the hearings took place on the Motion to Dismiss, and to generally indicate the long period of time between the initial investigation after Belluomini's death in 2000, and the state of evidence after Moreno was indicted in November of 2019.

During the initial investigation, Curtis Steele (**Steele**) said that he saw Belluomini struggle to light a cigarette until Moreno helped her; he is now deceased. James Hueu (**Hueu**) reported that Belluomini and Moreno appeared to be having a good time together and she did not appear to be bothered by Moreno. Hueu no longer remembers the evening.

David Sarandria (**Sarandria**), the owner of Henry's, observed that Belluomini was acting out of character that night, and that she might have been under the influence of something. He had known Belluomini for six years and had never seen her "so messed up." In 2023, Moreno attempted to locate Sarandria and requested assistance from the State. The State's investigator testified that Sarandria resides in Arizona.

During the initial investigation, Feigum reported that both he and Moreno were trying to take Belluomini home that night, that an off-duty bartender (**Hancock**) arranged a cab for Belluomini, that Moreno got into the cab first, and Belluomini got in after him. Feigum asked Belluomini something to the effect of "you sure you want to go with this guy," meaning Moreno, and she responded "well, yeah. It'll be all right [sic]." Feigum has passed away.

The cab driver, Robert Lewis (**Lewis**), reported that he was parked outside of Henry's at around 10:00 p.m., on October 26, 2000, and shortly afterwards, he observed Moreno kissing Belluomini while Hancock was speaking to her outside of Henry's. Hancock gave Belluomini's keys to Lewis and told him to give them back to her only after they got to her Apartment. Moreno told Lewis, "I'm gonna ride with you, but I want you to bring me

back." Before leaving the parking lot, Moreno told Lewis to stop so he could get some beer out of his car. After retrieving a cooler from a vehicle, Moreno got back in the cab and Lewis exited the parking area. Belluomini and Moreno talked to each other during the ride, but Lewis could not recall what they said. After they arrived at Southpointe, Moreno exited the cab and Belluomini leaned forward between the two front seats and whispered to Lewis, "Don't leave me." Lewis believed Belluomini was joking and helped her out of the cab. After Moreno exited the cab, he told Lewis to wait for him and that he wanted to be picked up at 6:00 a.m. Lewis declined Moreno's requests. Lewis believed Moreno and Belluomini were both intoxicated, and he observed that Belluomini was unsteady on her feet, Moreno's speech was slurred, and it was raining heavily that night. Lewis has since died.

Southpointe Witnesses

Julie Morioka and her husband Danny Morioka (**Danny**) shared a wall with Belluomini's Apartment. Neither of them heard anything suspicious the night of October 26, 2000. During the initial investigation, Danny stated that he was awake until 1:00 a.m., putting together an entertainment set. In 2023, neither Moreno nor the State was able to locate the Moriokas.

Edmund Engel and Jodee Engel (the **Engels**) were Belluomini's downstairs neighbors. Edmund heard a toilet flush in Belluomini's apartment around 1:00 a.m., and again at 3:00 a.m., followed by the sound of bath water flowing. Edmund did not hear any yelling, screaming, or fighting coming from the Apartment. After the Circuit Court held the first hearing on the

Motion to Dismiss, the State obtained a local address contact information for Mr. Engel using a police-only subscription service.  Moreno was unable to locate the Engels, but believed Ms. Engel resided in Oregon.

Glory Boteilho lived in an adjacent building and was home all evening from 5:00 p.m., until 7:00 a.m. the following morning.  During the initial investigation, she said that she did not hear or see anything unusual.  Neither Moreno nor the State was able to locate her in 2023.

Eliezer Alcain (**Alcain**) lived in an adjacent building and was home all evening from 9:30 p.m., until 4:30 a.m. the following morning.  Alcain saw nothing suspicious, and his dog did not bark throughout the night or make any unusual disturbances.  Neither Moreno nor the State were able to locate Alcain in 2023.

Kelly Lopes (**Lopes**) reported he was sitting on his outside balcony from midnight until 2:00 a.m.; Lopes's balcony faced the parking lot near Belluomini's building.  Lopes did not hear or see anything strange or unusual in the parking lot or near Belluomini's building; he has since had a stroke and no longer has memory of the night in question.

Susan Martin (**Martin**) was on her lanai between 10:00 p.m., and 10:45 p.m. to watch the rain; she did not see anything out of the ordinary.  Neither Moreno nor the State was able to locate her in 2023.

Moreno's Written Statement:

Cuomo and Kaya interviewed Moreno on or about November 3, 2000, one week after Belluomini's death.  Moreno gave

a written statement that he met Belluomini that night, they eventually went back to her Apartment, engaged in consensual sex, showered, and that he left an uninjured Belluomini shortly after. Moreno reported that he walked from the Apartment to the beach to finish the beers that he had in his cooler, after which he walked back to Henry's to retrieve his truck.

Forensic Evidence

On October 28, 2000, Dr. Anthony Manoukian (**Dr. Manoukian**), medical examiner and forensic pathologist for Maui County, performed an autopsy on Belluomini. He reported two lacerations to Belluomini's scalp, one above her forehead and one above her ear. Her skull was not fractured. She died as the result of a brain hemorrhage at the base of the skull. Though Kaya's investigative report states that Belluomini had a fractured right wrist, Dr. Manoukian's autopsy report does not indicate a wrist fracture, nor does it indicate the volume of blood remaining in her body. Dr. Manoukian concluded Belluomini's manner of death was homicide. Dr. Manoukian collected DNA swabs from Belluomini's mouth and vagina, but he did not document the procedure used. At a Circuit Court hearing concerning the admissibility of DNA evidence, the State called Former MPD Crime Scene Technician, Vincent Souki (**Souki**), who testified that Dr. Manoukian did not properly handle the DNA evidence and never submitted them for processing. Souki testified that, of the close to a thousand autopsies he attended as a crime scene technician, he never observed another medical examiner divert from normal procedure in the way Dr. Manoukian did. Dr. Manoukian's report indicated the presence of a reddish

dye in Belluomini's hair. Kaya testified at the hearing on the Motion to Dismiss that he later spoke to Dr. Manoukian who told him that the red substance was blood, not hair dye, contrary to his report. The Circuit Court found Kaya's 2001 report more credible than his 2023 in-court testimony, and that factual questions exist about whether Belluomini had hair dye or blood in her hair. The autopsy also includes a neuropathological consultation by Dr. John Hardman (**Dr. Hardman**) – also deceased in 2023 – and a toxicology report by Dr. Clifford Wong (**Dr. Wong**), which indicated Belluomini's blood alcohol content (**BAC**) at the time of death was 0.187. Dr. Hardman did not opine on a manner of death, but he noted that intoxication and barbiturate levels in Belluomini's blood were likely contributory, and that asphyxiation cannot be ruled out as a cause of death. Dr. Manoukian's report omits reference to asphyxiation as a possible cause of death. Because Dr. Manoukian had passed away, the State had forensic pathologist Dr. Rachel Lange (**Dr. Lange**) review Dr. Manoukian's original report and the case file in 2019. Based on Dr. Manoukian's report, Dr. Lange concluded the manner of death was homicide.

In May 2001, Cuomo contacted Dr. Michael Baden (**Dr. Baden**), a forensic pathologist associated with New York State Police Crime Lab. Cuomo apparently also contacted Dr. Henry Lee (**Dr. Lee**) to review the case photos. As a basis for the supplemental medical consultation, Cuomo wrote in his report: "I was concerned because the brain injury was on the opposite side of the external injury." Dr. Baden believed Belluomini's brain injury was a contra-coup injury, meaning that the internal injury

occurred on the opposite side of the external injury, which is much more consistent with a fall (a head in motion striking a stationary object) than it is with an object striking the head. Dr. Baden opined, based on the materials reviewed, that the manner of death is undetermined. Dr. Lee opined that, based on the crime scene photographs, it did not appear Belluomini's injuries were sustained within the Apartment. Dr. Lee is reportedly retired and there are no findings regarding Dr. Baden's availability to testify. However, Cuomo is dead. Kaya stated he did not know why Cuomo felt he needed a second opinion as to the manner of death.

### Disposition of the Investigation

Kaya's 2001 report closes with the statement: "the manner of death is undeterminable, with the two most likely scenarios being either an accidental fall or an intentional act of some kind as in the case of being shoved." At a hearing on the Motion to Dismiss, Kaya testified his conclusion was incorrect and should have reflected the manner of death as homicide, consistent with Dr. Manoukian's report. The Circuit Court found Kaya's 2001 report more credible than his 2023 testimony. Kaya's report further stated that an examination of the Apartment, including Belluomini's bedroom, "did not yield a location from which her injuries may have occurred." It also stated that "the case has been sent to the Department of the Prosecuting Attorney for review." At a hearing on a motion to suppress, Kaya testified he submitted his report to the prosecutor's office in September of 2001.

9

Further Post-Investigation Facts

Aside from meeting with Belluomini's son Steven Bruner (**Bruner**) in 2007, the MPD undertook no further investigation into Belluomini's death after 2001. In 2017, Souki, who was getting ready to retire, informed MPD Lieutenant Nelson Hamilton (**Hamilton**) about the prior investigation into Belluomini's death. After reviewing the case files, Hamilton indicated he believed the case was solvable, that it was ready to go to trial, and that Moreno was a "clear suspect." Hamilton presented the materials to the prosecutor's office. The DNA swabs that Dr. Manoukian took of Belluomini's body were recovered from "the old morgue" and sent for testing, which yielded a positive match for Moreno. Hamilton indicated he expected the DNA to match Moreno because Moreno informed MPD he had consensual sex with Belluomini on the night of October 26, 2000. Aside from Dr. Lange's 2022 opinion, which was based in large part on Dr. Manoukian's report, no other evidence was presented to the grand jury that could not have been presented eighteen years prior.

Circuit Court's Disposition of the Motion to Dismiss

At a hearing on the Motion to Dismiss, Kaya testified, *inter alia*, as follows.

Kaya had never previously consulted with another medical examiner besides the one who performed the autopsy, but for some reason his supervisor Cuomo decided he needed to. When asked about the bedroom door being found locked, Belluomini's son Bruner had said that his mother habitually locked her bedroom door. There was no visible damage or disturbance to the Apartment and no presence of blood, but there was soil on the

10

carpet. Belluomini's house keys were in her Apartment, and some of her former long-term boyfriends "may have been in possession" of copies of the keys, including former boyfriend David Boteilho (**David**). David had told Kaya that he took a call from Belluomini early the morning of October 27, 2000, shortly after midnight, and Belluomini said she thought there was someone outside possibly trying to gain entrance into her Apartment. David told her to call the police. Levi Boteilho, David's son, said he also received a phone call from Belluomini two hours later. Thus, Kaya concluded Belluomini was still alive at 3:00 a.m., on October 27, 2000. Kaya received information that Belluomini was afraid of "another former boyfriend," Dennis Henderson (**Henderson**). Kaya "received[] information that," some days prior, Henderson was at Belluomini's house at 2:00 a.m., and she asked him to leave because another male was about to come over and she did not "want any issues."

During MPD questioning, Moreno stated that he went to Belluomini's apartment after they left Henry's, they had consensual vaginal and anal sex, Belluomini defecated herself during the anal sex, Moreno obtained towels so that they could both clean themselves off, and Moreno placed a towel between Belluomini's legs. Moreno initially stated that he and Belluomini showered together, but later said he was the only one who showered. Moreno's written statement stated that he walked to the beach to "finish [his] beers, 3 or 4," but it is unclear as to whether he meant three or four beers, or three or four o'clock in the morning.

In granting the Motion to Dismiss, the Circuit Court concluded, *inter alia*, as follows.

There was an eighteen-year lapse in time between investigation and indictment. The investigatory work from 2017 to 2019 uncovered no new evidence. Because of the delay, several witnesses critical to the defense died, and several more cannot be located despite Moreno's good faith efforts. Among other things, Moreno is unable to ask Cuomo why he sought a second opinion as to the cause of death. Cuomo's testimony may have helped support Moreno's theory of an accidental fall or that Belluomini was killed by someone else, outside of her Apartment. Moreno could not question Cuomo as to the reason for the delay in prosecution or as to the differences between Moreno's written statement and oral statement, as alleged by Kaya. Moreno is unable to question Dr. Manoukian about: the "unorthodox" DNA swabbing procedure he employed; Dr. Hardman's conclusion that asphyxiation cannot be ruled out; Dr. Baden's opinion that the likely cause of death was a fall; why Belluomini's wrist fracture was missing from his report; why he purportedly told Kaya the presence of red hair dye in the report was a mistake; and why he did not measure the level of blood in Belluomini's body, which may support a theory that she was injured outside of the Apartment. Moreno cannot question Lewis about whether it was raining that night, about Belluomini's level of intoxication, or whether she was acting consistently with someone desirous of engaging in sexual intercourse. Lewis's statement about Moreno getting his cooler from his car may tend to corroborate Moreno's account to MPD that he left the Apartment early enough to go to

12

the beach to finish his beers. Moreno cannot question Feigum about how Belluomini was acting, her level of intoxication, and that she said she wanted to go home with Moreno. Evidence from Belluomini's neighbors that nothing unusual was observed or heard that night would support Dr. Baden's opinion that she died from a fall rather than from being struck, which in turn supports Moreno's theory of an accidental death. Finally, the State provided no justification for the delay.

The State timely appealed the Dismissal Order.

In State v. Higa, 102 Hawaiʻi 183, 186-87, 74 P.3d 6, 9-10 (2003), the supreme court articulated the standard of review for an appeal from an order granting a motion to dismiss for pre-indictment delay as follows:

> In reviewing a constitutional due process claim of prejudice engendered by preindictment delay, the due process inquiry must consider the reasons for the delay in prosecution as well as the prejudice to the accused. Therefore, a balancing approach is applied, weighing the substantial prejudice to the defendant's right to a fair trial against the reasons for the delay.
>
> We review a circuit court's findings of fact in a pretrial ruling according to the following standard: Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard.

(cleaned up). "[A] COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each case." State v. Miller, 105 Hawaiʻi 394, 400, 98 P.3d 265, 271 (App. 2004). The Circuit Court's determination of substantial prejudice to Moreno's due process

13

right to a fair trial presents mixed questions of fact and law and is reviewed for clear error.

Based on the record in this case, including the above, we conclude that the Circuit Court did not clearly err in concluding that Moreno showed substantial prejudice in conjunction with the eighteen-year delay in the prosecution of the case. In particular, the Circuit Court did not err in concluding that the deaths of Dr. Manoukian, Dr. Hardman, Cuomo, Lewis, Feigum, and Steele, as well as the memory loss or other unavailability of multiple other witnesses resulted in the loss of significant evidence that potentially corroborated Moreno's statements and theories of the case, and foreclosed significant avenues to challenge and defend against the State's case against him.

The State also does not challenge the Circuit Court findings and conclusions that the delay spanned over eighteen years, no new evidence was found, and that it provided no express reason or justification for the delay.

Accordingly, we conclude that the Circuit Court did not err or abuse its discretion in balancing the actual substantial prejudice established by Moreno against the State's explanation for the delayed prosecution and dismissing the case.

For these reasons, the Circuit Court's August 7, 2023 Dismissal Order is affirmed.

DATED:  Honolulu, Hawaiʻi, September 26, 2025.

On the briefs:

Chad Kumagai,
Deputy Prosecuting Attorney,
County of Maui,
for Plaintiff-Appellant.

Matthew S. Kohm,
for Defendant-Appellee.

/s/ Karen T. Nakasone
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge